UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                        Case No. 19-CR-02

ALEXANDER BEBRIS,

        Defendant.

## UNITED STATES' POST-HEARING MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

The United States of America, by and through its attorneys, Matthew D. Krueger, United States Attorney, and Benjamin W. Proctor and Daniel R. Humble, Assistant United States Attorneys, hereby files this memorandum responding to defendant Alexander Bebris' "Supplemental Brief Regarding His Motion to Suppress and Non-Party Facebook's Motion to Quash Defendant's Subpoena." Doc. #49.

I.    Summary of Proceedings.

On August 22, 2019, Bebris filed a motion to suppress evidence and statements, and he requested an evidentiary hearing. Doc. #28, 30. At issue is whether Bebris' Fourth Amendment rights were somehow violated when private entities and law enforcement reviewed the illegal images he uploaded to Facebook. The Court set an evidentiary hearing for December 3, 2019, and Bebris issued

subpoenas to compel testimony from representatives of Facebook, Microsoft, and the National Center for Missing and Exploited Children ("NCMEC"). *See* Docs. #29, 34.

On November 27, 2019, Facebook filed a motion to quash the subpoena, as well as a declaration from Michael Francis Xavier Gillin II, Project Manager for Safety and Community Operations at Facebook. Doc. #40; Doc. #41 at 5-7 ("Gillin Decl."). On November 30, 2019, the parties submitted a stipulation regarding testimony from Microsoft. Doc. #43

On December 3, 2019, the evidentiary hearing went forward with testimony from John Shehan, Vice President of the Exploited Child Division at NCMEC. Doc. #46; Doc. #48 (Evidentiary Hearing Tr.). Mr. Shehan testified regarding NCMEC's organization, structure, and history. Tr. 13-17. He also walked through the content of the two CyberTipline Reports at the center of this case: CyberTipline Report 39932621 and Report 30017882. *See* Tr. 26-40; Doc. #44 Exs. A-B. The CyberTipline Reports stemmed from cybertips received by NCMEC from Facebook stating that Facebook identified child pornography images uploaded by Bebris to Facebook on September 7, 2019, and September 9, 2019. Doc. #44 Exs. A-B.

On December 23, 2019, Bebris filed his post-hearing, supplemental brief in support of his motion and in opposition to Facebook's motion to quash. Doc. #49. In his brief, Bebris asks the Court for two things. First, he asks the Court to find that NCMEC is a government agent for purposes of the Fourth Amendment. Second, he asks the Court to order a Facebook representative to appear at another evidentiary hearing so that Bebris can ask that Facebook witness the 100+ questions he

2

submitted to Facebook in writing, all in an effort to show Facebook was also a "government agent." *See* Docs. #49, 49-1.

On January 10, 2020, Facebook filed its response, as well as a supplemental declaration of Michael Francis Xavier Gillin II. Docs. #52; Doc. #53 at 4-6 ("Gillin Supp. Decl."). Facebook asserts that the two declarations it provided address the relevant issues, and that Bebris is not entitled to live testimony from a Facebook representative. Doc. #52.

The United States now files its post-hearing memorandum in opposition to Bebris' motion to suppress. As the Court anticipated at the end of the evidentiary hearing, the government's pre-hearing memorandum already covers most key factual and legal issues. *See* Tr. 87-88; Doc. #44. Therefore, this memorandum is intended only as a supplement to that memorandum. In sum, the government believes that the record is complete, and that Bebris' motion to suppress should be denied.

II. The Evidence in the Record Adequately Addresses the Issues in Dispute, and Further Testimony is Not Necessary.

Bebris' primary argument is that his Fourth Amendment rights were violated when Facebook identified and reviewed the child pornography files he uploaded to Facebook on September 7 and 9, 2019. To succeed on this position, Bebris bears the burden of establishing <u>all</u> of the following factors:

1. Bebris had a reasonable expectation of privacy in the child pornography files he uploaded to Facebook on September 7 and 9, 2019; and

2. Facebook was NCMEC's "agent" when Facebook identified and reviewed the child pornography files Bebris uploaded to Facebook; and

3. NCMEC was a "government agent" when Facebook identified and reviewed the child pornography files, thus making Facebook a "government agent" at that time.

The evidence shows that Bebris is unable to establish these factors. As discussed in the government's pre-hearing brief, Bebris lacked a reasonable expectation of privacy in the illegal files he uploaded, which violated Facebook's terms of service. *See* Doc. #44 at 7-9.[1] And, even assuming for the sake of argument that NCMEC was deemed a "government agent" (though it was not), Bebris cannot show that Facebook was acting as NCMEC's agent when it reviewed the files.[2]

Indeed, Bebris' most glaring shortcoming—and the focus of most of his brief—concerns whether Facebook can be considered a "government agent." It cannot, for the reasons discussed below. And every other court to consider the same argument presented by Bebris—that an electronic service provide ("ESP"), like Facebook here, was a "government agent" when it reported child pornography to NCMEC—has rejected the argument.

---

[1] The government's pre-hearing brief sets forth the facts underlying its position that Bebris lacked a reasonable expectation of privacy in the child pornography files. *See* Doc. #44 at 7-9. Bebris also sets forth his position in his initial brief. *See* Doc. #30 at 17-19. The facts presented at the evidentiary hearing did not affect this aspect of the parties' arguments; therefore, the government refers the Court to its prior submission on this point.

[2] As noted, Bebris' primary argument requires the Court to find that (1) NCMEC was a government agent, and that (2) Facebook was an agent of NCMEC. For the reasons discussed herein, Bebris cannot establish that Facebook was an agent of NCMEC. Thus, the Court need not resolve NCMEC's status. However, to the extent that NCMEC's status is relevant, the record shows that NCMEC is not government agent. Importantly, as John Shehan testified, NCMEC was created by the Walsh family after their son was abducted and murdered. Tr. 13. It is a private, non-profit entity with a mission to help reunite families with missing children, reduce child exploitation, and prevent child victimization. Tr. 13-14. *But see United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016).

4

III.    Bebris' Argument that Facebook is a "Government Agent" Ignores the Facts and the Applicable Law.

To determine whether a private party acted as a government agent, courts examine (1) "whether the government knew of and acquiesced in the intrusive conduct," and (2) "'whether the private party's purpose in conducting the search was to assist law enforcement agents or to further its own ends.'" *United States v. Ginglen,* 467 F.3d 1071, 1074 (7th Cir. 2006) (quoting *United States v. Shahid*, 117 F.3d 322, 325 (7th Cir. 1997)); *see also United States v. Koenig*, 856 F.2d 843, 847 (7th Cir. 1988). "'Other useful criteria are whether the private actor acted at the request of the government and whether the government offered the private actor a reward.'" *Ginglen*, 467 F.3d at 1074. The defendant bears the burden of proving that the private entity acted as a government agent regarding the search or seizure in question. *Id.*; *Koenig*, 856 F.2d at 847.

Contrary to Bebris' assertions, the record is more than sufficient for the Court to address these questions. Indeed, the evidence establishes that (1) the government did not "know of and acquiesce to" Facebook's actions, and (2) Facebook's actions were motivated by its own business interests.

   A. The record establishes that the government did not "know of and acquiesce to" Facebook's review of images Bebris uploaded to his accounts.

To establish that the government "knew of an acquiesced to" the private party's intrusive conduct, the defendant needs to show that the government induced the private parties' actions as to the search and seizure at issue. *See, e.g., Shahid*, 117 F.3d at 325-26 ("A private party cannot be deemed a government agent unless it

5

was induced to act by some government action." (citing *Koenig*, 856 F.2d at 850)). On this point, both NCMEC's John Shehan and Facebook's Michael Francis Xavier Gillin II provided evidence that neither NCMEC nor any government entity induced Facebook to search Bebris' files. For example, John Shehan was asked about whether NCMEC directed Facebook's conduct at issue:

> AUSA: Does NCMEC control or demand how Facebook finds or searches for or identifies images that they have submitted as CyberTips to NCMEC?
>
> SHEHAN: No.

Tr. 25-26. In case there was any possible confusion on this point, Mr. Shehan again addressed the issue:

> AUSA: There were some discussions earlier about meetings between Facebook and NCMEC. I just want to just clarify, did NCMEC provide any direction to Facebook with regard to the internal investigation by Facebook that generated these CyberTips?
>
> SHEHAN: No.

Tr. 74. And, Facebook addressed this issue in its initial and supplemental declarations:

> Facebook has no record of receiving legal process from the Government for the account holders associated with the accounts reported in CyberTipline reports 39932621 and 40017882. Prior to receipt of this subpoena, other than the initial submission of these two CyberTipline reports, Facebook has identified no records of communication with NCMEC in this matter. Similarly, other than its counsel's communications with the Government about the defense subpoena, Facebook has identified no records of communications with the Government regarding the images or content of the CyberTipline reports.

*See* Gillin Supp. Decl. ¶ 8.

Bebris ignores this evidence. Instead, he contends that further testimony is needed from Facebook regarding its relationship with NCMEC. *See* Doc. #49 at 14. But this is a red herring. There was extensive testimony by NCMEC about its overall relationship with Facebook, and none of that is particularly relevant to the question that matters: whether NCMEC induced Facebook to search images uploaded by Bebris to Facebook's website on September 7 and 9, 2019. Since reliable evidence from the parties involved already shows that neither NCMEC nor any other entity induced Facebook's conduct, Bebris' argument must fail.

> B. It is undisputed Facebook's actions were motivated by its own business interest in removing illegal content from its platform.

Moving on, the next hurdle for Bebris is establishing "some exercise of governmental power over [Facebook], such that the [Facebook] may be said to have acted on behalf of the government rather than for its own, private purposes." *See Koenig*, 856 F.2d at 849; *Ginglen*, 467 F.3d at 1074. In other words, if Facebook was motivated, at least in part, by private concerns, then Bebris' argument fails.

It is undisputed that Facebook identified and reviewed Bebris' illegal files because it has a private business interest in keeping child pornography off its website. Bebris has already conceded this fact. *See* Doc. #30 at 15 (noting that "Facebook does have private interests in keeping child pornography off its website"). And Facebook has explained its reasoning for reviewing the files uploaded to Bebris' account:

> Facebook has an independent business purpose in keeping its platform safe and free from harmful content and conduct, including content and conduct that sexually exploits children. As our Community Standards

7

> explain, "We do not allow content that sexually exploits or endangers children. When we become aware of apparent child exploitation, we report it to the National Center for Missing and Exploited Children (NCMEC), in compliance with applicable law."
>
> Facebook identifies content and conduct that might violate its Community Standards in various ways. As set out below, CyberTipline Reports 39932621 and 40017882 were based on images Facebook identified using a software called PhotoDNA[.] . . . Facebook uses PhotoDNA software to identify potential child exploitation content, as well as to identify other types of violations of its Terms of Service or Community Standards.

Gillin Supp. Decl. ¶¶ 3-4. This evidence is on point and reliable.

In his supplemental brief, Bebris contends that because Facebook refers child pornography content found on its website to NCMEC, Facebook likely acted with the goal of assisting law enforcement. Doc. #49 at 24. This allegation, however, conflicts with the evidence and the law. Facebook's referral of child pornography content to NCMEC (as required by statute) does not somehow mean Facebook acted on behalf of the government rather than for its own, private purpose. *See, e.g.*, *Shahid*, 117 F.3d at 326 (rejecting argument that mall security guard was a "government actor"); *Koenig,* 856 F.2d at 849-50 (rejecting argument that Federal Express was a government actor when it searched package).

On this point, courts around the country have rejected assertions like that presented by Bebris. *See, e.g., United States v. Cameron*, 699 F.3d 621, 637-38 (1st Cir. 2012) ("[I]t is certainly the case that combating child pornography is a government interest. However, this does not mean that Yahoo! cannot voluntarily choose to have the same interest."); *United States v. Stevenson*, 727 F.3d 826, 830 (8th Cir. 2013) (noting that a "reporting requirement, standing alone, does not

8

transform an Internet service provider into a government agent whenever it chooses to scan files sent on its network for child pornography"); *United States v. Richardson*, 607 F.3d 357, 365 (4th Cir. 2010) (rejecting the argument that a legal mandate for AOL to cooperate with NCMEC meant that the government "activity encouraged" AOL's search and thus triggered Fourth Amendment protections); *United States v. Coyne*, 387 F. Supp. 3d 387, 396 (D. Vt. 2018) *United States v. Wolfenbarger*, Case No. 16-CR-519, 2019 WL 4085260, at *17 (N.D. Cal. Aug. 29, 2019).

IV. Facebook's Initial Declaration and Supplemental Declaration are Sufficient and Reliable.

Bebris spends most of his supplemental brief responding to Facebook's motion to quash. Doc. #49 at 13-23. His primary contentions are that (1) Facebook's declaration inadequately addresses the relationship between Facebook and NCMEC; (2) Facebook's declaration inadequately addresses whether a person at Facebook actually viewed (i.e. "searched") the images uploaded by Bebris before sending them to NCMEC; and (3) Facebook's declaration is unreliable because it conflicts with Shehan's testimony. Doc. # 49 at 13-23. Of note, Bebris made these arguments before Facebook filed its supplemental declaration. Doc. #52-53.

At the outset, Bebris is wrong to argue that Facebook's declaration does not adequately discuss its "relationship with NCMEC, PhotoDNA, and relationship with other government agencies." As discussed above, the record covers whether NCMEC or the government induced Facebook to search the three illegal Bebris uploaded to Facebook in September 2019 (they did not), and whether Facebook

9

searched these images at least in part based on its own private purposes (it did). More information about Facebook's relationship with NCMEC, PhotoDNA, and other government entities would not assist the Court.

Next, Facebook squarely answered the question of whether a person at Facebook reviewed the three images at issue before Facebook sent that information to NCMEC. This question is relevant to Bebris' alternative argument—that, even if Facebook is (correctly) considered a private entity, there could still be a Fourth Amendment violation if law enforcement "expanded the scope of the initial private search." Doc. #30 at 19. In other words, if a person at Facebook did not review the images, the subsequent review of the images by law enforcement could be considered an unlawful search.

According to Facebook, the images Facebook sent to NCMEC that became part of CyberTipline Reports 39932621 and 40017882 were reviewed by a person before they were submitted to NCMEC. Gillin Decl. ¶¶ 5-6; Gillin Supp. Decl. ¶¶ 6-7. As noted by Gillin, "[t]his is reflected in the CyberTipline Reports where the reports document 'Did reporting ESP view the entire contents of uploaded files?' and the report reflects an answer of 'Yes.'" Gillin Supp. Decl. ¶ 7. "When Facebook responds to this question with an affirmative 'Yes,' it means that a person viewed the image submitted in the CyberTipline report." Gillin Supp. Decl. ¶ 7. All of this is consistent with Shehan's testimony, wherein he stated that when Facebook answered "Yes" to the question "Did reporting ESP view entire contents of uploaded file?" this indicated that "someone on their end . . . physically put eyes onto that file,

10

in this case an image, when they reported it." Tr. 31. Shehan continued that this "is an important field" because if the ESP does not answer "Yes," then NCMEC staff cannot review the file. Tr. 31. Moreover, Shehan confirmed that NCMEC provided training to all of the ESPs specifically regarding how to answer this field in the CyberTipline report:

> AUSA: And, again, going back to when that is marked "yes" and NCMEC's understanding that that means that the provider has had somebody associated with the provider physically view that. The answer of that question "yes" in NCMEC's understanding, is that consistent with NCMEC's training to others as to how to answer that question?
>
> SHEHAN: Yes. When we added this field into the CyberTipline in creating this process, we educated every electronic service provider to that field and the workflow outcomes depending on those—those delineations and how we interpreted the use of that field.

Tr. 33-34. In light of this record, Bebris' assertion that there is insufficient evidence on this point lacks merit.

Relatedly, even if, for the sake of argument, a Facebook associate did not personally review the images forwarded as part of the cybertips, the use of PhotoDNA is equivalent to a private search, thus frustrating any expectation of privacy Bebris may have had in the files. As the Fifth Circuit found in *United States v. Reddick*, 900 F.3d at 639 (5th Cir. 2018), PhotoDNA relies on hash-values to identify child pornography. "[H]ash value comparison 'allows law enforcement to identify child pornography with almost absolute certainty,' since hash values are 'specific to the makeup of a particular image's data.'" 900 F.3d at 639 (quoting *United States v. Larman*, 547 F. App'x 475, 477 (5th Cir. 2013)). Hence, when agents

11

subsequently receive and review files identified through PhotoDNA as having hash-values matching known child pornography files, that review does not "'significant[ly] expan[d] the search that had been conducted previously by a private party' sufficient to constitute 'a separate search.'" *Reddick*, 900 F.3d at 639 (quoting *Walter v. United States*, 447 U.S. 649, 657 (1980)). The investigator's "visual review of the suspect images—a step which merely dispelled any residual doubt about the contents of the files—was akin to the government's agents' decision to conduct chemical tests on the white powder in [*United States v.*] *Jacobson* [, 466 U.S. 109 (1984)]." *Id.*

Finally, despite Bebris' assertion, Facebook's initial declaration did not conflict materially with Shehan's testimony. At issue is Gillin's statement that "Facebook does not receive training from NCMEC regarding the use or operation of the PhotoDNA software or its processes for reporting to the CyberTipline." *See* Gillin Decl. ¶ 4. Bebris wants to read this statement as meaning that NCMEC did not train Facebook regarding the CyberTipline, which he contends conflicts with Shehan's testimony that NCMEC did provide training to Facebook. *See* Doc. #49 at 17; Tr. 44. But a fair reading of the statement reveals that Gillin likely meant that Facebook did not receive training from NCMEC regarding *Facebook's* use of PhotoDNA or *Facebook's* internal processes for reporting to the CyberTipline. Indeed, Gillin's supplemental declaration clarifies that this was the case. *See* Doc. #52; Gillin Supp. Decl. ¶ 5.[3]

---

[3] Bebris and Facebook spar over whether Bebris has a constitutional right to live testimony

V.    Good Faith

As explained in the United States pre-hearing memorandum, even assuming for the sake of argument that a Fourth Amendment violation occurred, the evidence supports a finding of good faith on the part of law enforcement. Doc. #44 at 17-18. Notably, it is undisputed that Facebook answered "Yes" to the question "Did reporting ESP view entire contents of uploaded file?" on the CyberTipline Reports. *See* Gillin Supp. Decl. ¶¶ 6-7; Tr. 32-34. This conveyed to NCMEC that a person reviewed the images in the CyberTipline Reports prior to sending them to NCMEC. Tr. 31. In fact, if Facebook had not answered "Yes," NCMEC's system would have prevented NCMEC staff from reviewing the images. Tr. 31-32. This system was set up by NCMEC to prevent any potential constitutional concerns in light of recent court decisions. Tr. 33. All of the entities involved—Facebook, NCMEC, and local law enforcement—complied with their legal obligations, and there is no evidence of "deliberate, reckless, or grossly negligent conduct" by law enforcement agents. *See Herring v. United States*, 555 U.S. 135, 144 (2009). Hence, the good faith exception should apply to any potential Fourth Amendment violation.

---

from Facebook, and relatedly, whether live testimony is unduly burdensome to Facebook. Those parties are better positioned than the government to debate the burden imposed by live testimony. But, as explained herein, the government's position is that record is sufficient, and that the additional information Bebris seeks from Facebook is not material to the issues before the Court.

VI. Conclusion

For the reasons discussed above as well as in the government's pre-hearing memorandum, Doc. #44, Bebris' motion to suppress should be denied.

Dated at Milwaukee, Wisconsin, this 17th day of January, 2020.

        Respectfully submitted,

        MATTHEW D. KRUEGER
        United States Attorney

By:    s/Benjamin W. Proctor

        BENJAMIN W. PROCTOR
        DANIEL R. HUMBLE
        Assistant United States Attorneys
        Benjamin Proctor Bar No.: 1051904
        Office of the United States Attorney
        Eastern District of Wisconsin
        517 E. Wisconsin Ave. Suite 530
        Milwaukee, Wisconsin 53202
        Tel: (414) 297-1700
        Fax: (414) 297-1738
        Email: benjamin.proctor@usdoj.gov